In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 14-1269

DZEVAD HUREM,

*Plaintiff-Appellant,*

*v.*

NICKOLAS TAVARES, JOHN DINEEN, LILLIAN BEDIA, CAROL
FONTANETTA, and HECTOR DAVILA,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 1418—**Virginia M. Kendall**, *Judge.*

_____

ARGUED JANUARY 7, 2015 — DECIDED JULY 14, 2015

_____

Before WOOD, *Chief Judge*, and POSNER and EASTERBROOK,
*Circuit Judges.*

WOOD, *Chief Judge*. In October 2010 Nasreen Quadri
bought an apartment in the West Ridge area of Chicago. At
some point thereafter, she learned that the police had inves-
tigated a disturbance there, and so in January 2011 she visit-
ed the apartment with her real estate agent and a locksmith.
Quadri's agent called 911 after the group found Dzevad

Hurem in the unit. Hurem told an arriving police officer he had paid rent to Quadri's husband Moshim and obtained keys from him, but he failed to obtain a receipt, lease, or any other paperwork about his residence there. He refused to leave. Two days later, Quadri again found Hurem in the apartment, and her agent again called 911. Hurem still could not produce anything proving he had a right to be there, save for the keys and a piece of paper with Moshim's phone number written on it. Hurem again refused to leave. This time the officers arrested him, but ultimately he was not charged with any crime. Hurem sued the Quadris, the arresting officers, and the City of Chicago in state court for wrongful eviction and various civil rights violations. After removal, and after the Quadris and the City were dismissed as defendants, the district court granted partial summary judgment in favor of all but one remaining officer defendant and Hurem dropped his case against the last one. Hurem appeals, and we affirm.

**I**

Nasreen Quadri purchased apartment 3F at 6126 North Damen Avenue in Chicago in a foreclosure sale held in October 2010. As we have noted, the events underlying this case began on January 5, 2011, when Quadri and her property agent, Daniel Ju, visited the apartment along with a locksmith to investigate a report of a disturbance. They found Hurem inside; the police came in response to a 911 call; and Hurem told them that he was there legitimately. He said that the previous tenant had given him the keys before the foreclosure, and that he had paid rent to Moshim. The parties dispute the reason Hurem was not arrested at that time.

Two days later, Moshim and Nasreen Quadri returned to the Damen Avenue apartment, again with the real estate agent and locksmith in tow. Hurem was still there, and so Quadri's agent called 911. Chicago police officers responded to the call. Nasreen showed them paperwork confirming that she owned the apartment and told them that she and Moshim did not know Hurem. The officers asked Hurem for documentation of his right to be in the apartment, and he handed them a piece of paper with Moshim's phone number on it. He also told the new officers that he had paid rent to Moshim, but Moshim denied this. Beyond that, Hurem did not produce any proof that he had paid Moshim anything. Before the officers arrested Hurem, they gave him the option of leaving the apartment on his own. He refused to do so, and so they arrested him on the spot, without a warrant. Hurem later experienced chest pain at the police station and was taken to a nearby hospital. In the end, Hurem never faced charges in connection with the Quadris' apartment.

Invoking 42 U.S.C. § 1983, Hurem sued the Quadris along with the city and the five Chicago police officers who responded to the 911 call on January 7. His operative complaint at the time of summary judgment asserted claims of deprivation of property, deprivation of liberty (that is, the alleged false arrest), and excessive force. Before the summary judgment motion was filed, Hurem amended his complaint to omit the city as a defendant and settled with the Quadris. This left the five officers as defendants. The district court granted partial summary judgment to four of the officer defendants on most of Hurem's claims, leaving only the excessive force claim against Bedia for disposition. That part of the case was transferred to a magistrate judge after the parties consented to his jurisdiction. 28 U.S.C. § 636(c).

About seven months later, Hurem voluntarily dismissed his remaining claim against defendant Bedia and the court terminated the case. Hurem has appealed from that final judgment. See 28 U.S.C. § 1291.

**II**

We begin, as Hurem does, with his claim of false arrest. He contends that the officers who arrested him lacked probable cause to do so. See *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014). He must prevail on that point in order to move forward, because "the presence of probable cause makes a warrantless arrest reasonable under the Fourth Amendment." *Id.* The existence of probable cause is therefore an absolute defense to a § 1983 claim for false arrest. As we often have observed, "[p]robable cause to make an arrest exists when a reasonable person confronted with the sum total of the facts known to the officer at the time of the arrest would conclude that the person arrested has committed, is committing, or is about to commit a crime." *Venson v. Altamirano*, 749 F.3d 641, 649 (7th Cir. 2014). The defendants contend they had probable cause to arrest Hurem for criminal trespass to real property. See 720 ILCS 5/21-3(a)(1) (crime occurs when a person "knowingly and without lawful authority enters or remains within or on a building").

Hurem offers two reasons to reject that conclusion. The first is based on his understanding of the facts relating to his January 7 arrest along with events before that day, including Nasreen's first visit to the apartment on January 5. Hurem says, for example, that he had been living in the apartment for at least a month pursuant to a verbal agreement with the Quadris, and that on January 5 Moshim admitted that Hurem had paid him rent. (The defendants dispute both of

these assertions.) The difficulty with Hurem's reliance on these earlier events, assuming they occurred, is that there is no indication in the record that the arresting officers knew about them. Our evaluation of probable cause requires us to consider the arresting officers' knowledge *at the time of the arrest*. We cannot impute Hurem's own knowledge of past events to the officers who arrested him. Hurem refers to the presence of a Sergeant Willoughby at the January 5 incident, implying that Willoughby knew of Hurem's verbal rent agreement with Moshim, but there is no indication that Willoughby spoke to any of the officers who are defendants in this case before they responded to the 911 call on January 7. In fact, the January 7 team heard Moshim deny that such an arrangement existed, while everyone was at the apartment. Moreover, although the defendants acknowledge that one officer (Davila) who came to the apartment on January 7 also responded on January 5, Davila testified that he arrived on January 5 as Willoughby was leaving and never learned what occurred in the apartment that day.

The situation before the officers who responded on January 7 provided sufficient information for them reasonably to believe that Hurem had committed criminal trespass. They were confronted with conflicting stories—one from Hurem that he legitimately lived in the apartment and paid rent, the other from the Quadris to the contrary. Nothing prevented them from deciding to believe the Quadris. Officers may rely upon information that a reasonably credible putative witness or victim provides in deciding to make an arrest, even if the suspect says otherwise. See *Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013) (collecting cases). Although Hurem had a piece of paper with Moshim's phone number on it, that is the sole document he presented to show that he was

legally renting the apartment. He had no lease, no mail in his name showing the address of the apartment, and no person who could confirm his account. Even had there been mail, all that would have shown would be longer-term occupancy; it would have said little about whether that occupancy was authorized. The fact that he had keys to the apartment and claimed that the furniture was his did not automatically disqualify him as an unauthorized squatter. The Quadris, on the other hand, came to the apartment with a property agent and a locksmith and presented the officers with proof that they owned the apartment. They told the officers they had not rented it to Hurem.

Although it is certainly possible to envision a landlord-tenant relationship that is paper-free—indeed, we do not doubt that such relationships exist—the mere possibility of such an arrangement was not sufficient to defeat the existence of probable cause. Hurem's dearth of evidence that he had actually rented the apartment certainly did not help him. On the facts as they stood, the police reasonably found probable cause for the arrest.

Hurem's second argument about probable cause is a legal one: he contends that the defendants' failure to adhere to Illinois's Forcible Entry and Detainer Act in arresting him transformed his arrest into an unreasonable seizure as a matter of law. See 735 ILCS 5/9-101 *et seq.* This law prohibits anyone from entering property by force and provides a cause of action to those who are "entitled to the possession of lands or tenements" against those without such entitlement who occupy the owner's property. 735 ILCS 5/9-102(a)(2); see also *In re Williams*, 144 F.3d 544, 547–48 (7th Cir. 1998) (describing operation of the statute). Hurem contends that the

officers lacked probable cause to arrest him because "Illinois law did not allow police to evict and arrest an occupant for trespass as the Forcible Entry & Detainer Act was the sole means of evicting a person from his residence." Yet Hurem fails to connect the dots between the defendants' supposed violation of that statute and probable cause analysis.

We begin with a point that could, on its own, dispose of this argument: "state restrictions do not alter the Fourth Amendment's protections." *Virginia v. Moore*, 553 U.S. 164, 176 (2008); see also *Jackson v. Parker*, 627 F.3d 634, 640 (7th Cir. 2010) ("[S]tate law does not control the reasonableness inquiry under the Fourth Amendment."). A state may "choose[] to protect privacy beyond the level that the Fourth Amendment requires," but the Fourth Amendment requires only that an arrest be based upon probable cause, which "serves interests that have long been seen as sufficient to justify the seizure." *Moore*, 553 U.S. at 171, 173. The remedy for a violation of such a state law is in state court. We recognized in *Gordon v. Degelmann*, 29 F.3d 295, 301 (7th Cir. 1994), that Illinois's forcible entry statute imposes a prior procedural requirement before a person can be removed from a particular property: there must be a judicial hearing to determine a person's entitlement to remain. We observed that this procedure went beyond what the Fourth Amendment requires and concluded that a police officer's failure to afford the plaintiff the hearing mandated by state law "does not matter—not, at least, to a claim under the fourth amendment and § 1983," given the plaintiff's violation of Illinois's criminal trespass law. *Id.*

So it is in Hurem's case, and we decline his invitation to overrule *Gordon*. It may be that, as in *People v. Evans*,

516 N.E.2d 817 (Ill. App. Ct. 1987), the Quadris should have sought a remedy under Illinois's forcible entry law rather than call 911 after confronting Hurem at the apartment. But that does not mean that the *police* violated the Fourth Amendment in arresting Hurem. They had probable cause to arrest Hurem for violation of Illinois's criminal trespass statute, which as in *Gordon* "forbids exactly the conduct in which [Hurem] appeared (to [the defendants]) to be engaged." *Gordon*, 29 F.3d at 301. Hurem points to *Soldal v. Cook Cnty.*, 506 U.S. 56 (1992), as a reason for us to depart from this conclusion. We were already familiar with *Soldal* when we decided *Gordon*, where we noted that the question in *Soldal* "was whether taking away a mobile home is a 'seizure' under the fourth amendment." *Gordon*, 29 F.3d at 301; see also *Soldal*, 506 U.S. at 60 (issue was "whether the seizure and removal of the Soldals' trailer home implicated their Fourth Amendment rights"). No one disputes that Hurem was seized. In *Soldal*, the Supreme Court did not reach the question whether the removal of the mobile home was unreasonable and thus in violation of the Fourth Amendment, as is the issue here. So it is not the case, as Hurem argues, that *Soldal* controls our decision.

Hurem finally argues that the defendants are not entitled to qualified immunity against his claims. As in *Gordon*, because we conclude that the defendants did not violate the Fourth Amendment, we need not discuss whether they have immunity from suit.

## III

Hurem also argues that the defendants violated his Fifth Amendment right to due process by seizing his property without notice or an opportunity for a hearing. He intermin-

gles this issue with allusions to seizure of property (by which Hurem means his eviction from the apartment, not any kind of seizure of his furniture, for example) under the Fourth Amendment. This argument requires little comment because Hurem waived it. Not even a generous reading of the record reveals that Hurem adequately presented a constitutional due process claim related to his property in the district court. In his complaint, Hurem argued that he had been deprived of property, but only as a matter of state and municipal law, not under the federal constitution. At summary judgment, Hurem did not oppose the officers' motion on due process grounds; he presented only his excessive force and false arrest claims. We thus cannot consider these arguments on appeal. *Frey Corp. v. City of Peoria*, 735 F.3d 505, 509 (7th Cir. 2013). Nonetheless, we note that in arresting Hurem, the officers did not seize Hurem's property; they seized only Hurem himself. Thus he may have found it difficult to prevail on such a claim.

## IV

Hurem's dispute with the Quadris was unfortunate, but the events surrounding it did not give rise to a constitutional violation. He has not shown that the defendants lacked probable cause to arrest him, a necessary predicate for his false arrest claim, and he has waived any due process claim. We therefore AFFIRM the judgment of the district court.